CLERK'S OFFICE
A TRUE COPY
Nov 09, 2020
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br> )<br>Information associated with the Facebook user ID 100010098515219 )<br>that is stored at premises owned, maintained, controlled, or operated )<br>by Facebook Inc., more fully described in Attachment A ) | Case No.  20  MJ  223 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846,<br>and 18 U.S.C. §§ 922(g), 924<br>(c), 1956, and 1957 | Distribution of and conspiracy to distribute a controlled substance, possession of a<br>firearm by convicted felon; possession of a firearm in furtherance of drug<br>trafficking; laundering of monetary instruments and the conspiracy to do so |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Miguel A. Ortega, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:  November 9, 2020

_____
*Judge's signature*

City and state:  Milwaukee  WI

William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Miguel A. Ortega, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I have over six years of experience as a law enforcement officer through the Milwaukee Police Department (MPD). I was previously assigned to the Milwaukee Police Department's District No. 7 Anti-Gang Unit, which was involved in the investigation of offenses involving, but not limited to, narcotics, narcotics trafficking, and individuals prohibited from possessing firearms within the City of Milwaukee. I am currently assigned as a Federally Deputized Task Force Officer (TFO) with the Federal Bureau of Investigation's Southeastern Wisconsin Regional Gang Task Force since April of 2020.

3.     As a Police Officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances.  Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and users of controlled substances.  I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, analysis of phone and financial records, and the arrests of numerous drug traffickers.  I have also been the affiant of many search warrants. I have participated in the execution of numerous state and federal search warrants in which controlled substances, drug paraphernalia, drug proceeds, drug-related records, financial records, and electronic devices with data were seized.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

4.     Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers.  Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become

2

familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, sell, and distribute narcotics, and to collect and launder trafficking-derived proceeds.   I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5.     Based on my training and experience, I know that criminal investigations have been aided by subpoenas, warrants, and court orders related to electronic communication records by providing critical investigative leads and corroborative evidence.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957 have been committed by Marquan L. Clemmer.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

8.     On October 12, 2020, at approximately 2:15 p.m., law enforcement officers were conducting surveillance at Al's Wheels and Deals, a business located at 4270 N. 76th Street in Milwaukee, Wisconsin. Law enforcement was acting in an

3

undercover capacity and operating in an undercover government vehicle. Through investigation, law enforcement is aware that an individual identified as Shaft A. DARBY (DOB: 07/04/1991) is associated with Al's Wheels and Deals.

9.      At approximately 2:42 p.m., law enforcement observed a gray in color 2014 Jeep Grand Cherokee SUV bearing Wisconsin registration plate of 470-ZEC (VIN# 1C4RJFDJ9EC395246), hereinafter referred to as the "gray Jeep," enter the parking lot of Al's Wheels and Deals. Law enforcement then observed the gray Jeep parked next to a black in color 2018 Jeep Grand Cherokee SUV bearing Wisconsin registration plate of ABE-3330 (VIN# 1C4RJFN97JC310127), hereinafter referred to as the "black Jeep."

10.     Based upon previous traffic stops and encounters, law enforcement is aware that DARBY owns and operates the gray Jeep.

11.      DARBY has an active Felony Milwaukee Police Department suspect alert for fleeing/Eluding (Citation # BF906634-1).

12.     On October 12, 2020, at approximately 3:54 p.m., law enforcement observed DARBY, wearing a tan Burberry hat, black hooded sweatshirt and black jeans, exit the gray Jeep.  Law enforcement then observed DARBY enter the black Jeep. DARBY was then observed reversing the black Jeep towards the overhead door to the building of 4270 N. 76th Street. Law enforcement then observed DARBY exit the driver door and open the tailgate of the black Jeep. At this time, law enforcement was not able to observe DARBY's actions due to the position of other

4

vehicles obstructing their view. Law enforcement conducting surveillance advised other officers regarding the above-described observations.

13.    DARBY was then observed getting back into the driver seat of the black Jeep and parking the vehicle next to the gray Jeep. Affiant then observed a subject, later identified as Marquan L. CLEMMER (DOB: 08/18/1995), retrieve a purple "Bape" hooded sweatshirt from the rear passenger compartment of the gray Jeep. Affiant then observed CLEMMER open the rear left passenger door of the black Jeep. During this time affiant was not able to observe CLEMMER's actions while he was near the rear passenger door of the black Jeep.

14.    Additional law enforcement officers then entered into the parking lot of Al's Wheels and Deals. At this time, the driver door of the gray Jeep was open. As law enforcement exited the squad car and began walking towards the Jeep, CLEMMER exited the front passenger door of the gray Jeep and began running westbound towards N. 76th Street. DARBY exited the driver seat of the gray Jeep and fled westbound around the rear of the gray Jeep and then back northbound near the front entrance from where the officers entered.

15.    During flight, CLEMMER ran up onto a vehicle and jumped off the vehicle over a chain link fence surrounding the parking lot of Al's Wheels and Deals. Law enforcement followed CLEMMER and apprehended him on the median across the street of N. 76th Street. Upon CLEMMER's arrest, law enforcement located in his front right pants pocket four cell phones. Law enforcement also located a loaded black Glock 48 9 mm semi-automatic handgun from the bottom of CLEMMER's left

5

side pants leg. CLEMMER had a Jeep key fob around his neck and was also in possession of $80.00 in U.S. currency.

16. During flight, law enforcement gave DARBY multiple verbal commands to "stop." DARBY disregarded the verbal commands and continued to flee on foot. Law enforcement followed DARBY and observed DARBY throw a pill bottle on the roof of 4302 N. 76th Street. Law enforcement then apprehended DARBY.

17. While standing in the parking lot of Al's Wheels and Deals, law enforcement observed the pill bottle that DARBY threw on the top of the roof of 4302 N. 76th Street. Due to strong winds, the pill bottle blew off of the roof, and law enforcement located and secured the pill bottle, which was revealed to contain approximately 57 Oxycodone Hydrochloride 30 mg pills, a Schedule II controlled substance. The pill bottle did not contain a prescription label. Upon arrest, DARBY was found to be in possession of four cell phones. DARBY was also in possession of $2,920.10 in U.S. currency, and a substance that tested positive for the presence of marijuana and weighed two grams.

18. A search of both Jeeps was thereafter conducted. A search of the gray Jeep revealed the following, which list is non-exhaustive:

      a.    An open box of 150 count sandwich bags in center console;

      b.    Cartier sunglasses on driver seat;

      c.    Cartier sunglasses in sunglasses compartment;

6

d.    A large dry freezer bag containing clear plastic bags that contained a substance that tested positive for the presence of marijuana and weighed 497.51 grams on the front passenger floorboard;

e.    Drum magazine for firearm under front passenger seat;

f.    Audi Key in the center console;

g.    Tan FN BG 9mm semi-automatic (Serial # CSU0057167) handgun on the rear passenger floorboard in the middle of the compartment;

h.    WI auto plates, ABR5696, AAF4004, and AHT2100, in the trunk; and

i.    $120.00 in U.S. currency in the passenger door handle.

19.    A search of the black Jeep revealed the following, which list is non-exhaustive:

a.    A bottle of suspected promethazine with no label, weighing 70.91 grams with the bottle, in driver door map pocket;

b.    Verizon flip phone in glove box;

c.    Large clear plastic "pound bag" containing marijuana residue on passenger rear floorboard;

d.    Black backpack on passenger side rear seat containing a total of $67,410.00 in U.S. currency, clear plastic bags that contained a substance that tested positive for the presence of marijuana and weighed 134.92 grams, a digital scale, and identifiers of "Terrance M. CLEMMER";

7

e.     Gray duffle bag containing a large clear plastic dry freezer bag containing a substance that tested positive for the presence of marijuana and weighed 449.33 grams; and

f.     WI registration plate AJT-1610 in trunk.

20.     Video surveillance of Al's Wheels and Deals captured DARBY and CLEMMER on the day of their arrest. Surveillance depicts DARBY exiting the gray Jeep, operating the black Jeep, and meeting with another individual, who switches out the license plates of the black Jeep. DARBY is then observed driving the black Jeep to a location near the gray Jeep, which he then enters. DARBY and CLEMMER are both observed exiting the gray Jeep. Eventually, CLEMMER is depicted retrieving a black backpack from the gray Jeep and placing it in the rear compartment of the black Jeep. This black backpack matches the description of the black backpack containing a large sum of U.S. currency and marijuana located in the black Jeep.

21.     Affiant knows that controlled substances traffickers are frequently armed to protect themselves from rival drug dealers, opportunistic drug robbers, and law enforcement. The amount of controlled substances and U.S. currency recovered during the investigation is indicative of controlled substances trafficking.

22.     DARBY was convicted of a felony in Milwaukee County case number 2010CF005504 and is prohibited from possessing a firearm.

23.     CLEMMER was convicted of a felony in Milwaukee County case number 2017CF001641 and is prohibited from possessing a firearm. A wanted

8

check revealed CLEMMER is on active parole, which also prohibits CLEMMER from being in possession of a firearm.

24.     On October 12, 2020, law enforcement conducted follow-up investigation and determined that Marquan L. CLEMMER has a Facebook page with a Facebook Username "Marquan Clemmer," and Facebook User ID 100010098515219.

25.      The profile picture of "Marquan Clemmer" depicts an individual wearing a gray hooded sweater, white under shirt, gray sweat pants, and black and gray tennis shoes. Affiant also observed under the "Contact and Basic Info" tab a birth date of August 18, 1995, which is the known date of birth for CLEMMER.

26.     Affiant has examined the photo albums that have been uploaded to the Facebook page with Username "Marquan Clemmer." Based upon, in part, the photographs contained within the reviewed photo albums, as well as the matching date of birth, Affiant believes that this Facebook page is operated and controlled by CLEMMER.

27.     Affiant also observed numerous photographs depicting CLEMMER holding large amounts of U.S. currency and videos depicting CLEMMER possessing numerous cellular phones with lanyards around CLEMMER's neck.

28.     Affiant also observed a public post, dated September 25, 2020, at 9:41 a.m., by Marquan Clemmer, stating: "I ain't that weed man that's gone flirt w u b!tch I need my other dub." Based on affiant's training and experience and familiarity with this investigation, affiant believes that CLEMMER's statement

9

meant that he is not your marijuana dealer that is going to sit and talk during narcotic transactions due to narcotic proceeds that still need to be made.

29.    Based on affiant's training and experience, affiant is aware that individuals involved in trafficking controlled substances often use and possess multiple cellular devices to facilitate drug trafficking, compartmentalize their illegal activity, and avoid law enforcement detection.

30.    Based on affiant's training and experience, affiant is also aware that narcotic traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. Affiant knows that narcotic traffickers have also used websites and third-party applications, such as Facebook, to facilitate narcotics trafficking.

31.    On October 14, 2020, law enforcement sent a preservation letter to Facebook requesting the preservation of records.

32.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

33.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip

10

code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

34.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

35.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

36.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status"

11

updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

37.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

38.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or

12

item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

39.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

40.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

41.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

42.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

43.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

13

44.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

45.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

46.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

14

47.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses; investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information

15

may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

48.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

16

## CONCLUSION

50.     Based on the foregoing, I request that the Court issue the proposed search warrant.

51.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

52.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

17

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100010098515219 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

### I.  Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)  All contact and personal identifying information, including the full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers for Facebook Username "Marquan Clemmer," Facebook User ID 100010098515219.

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **August 1, 2020**, **to October 12, 2020**;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them,

including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **August 1, 2020, to October 12, 2020,** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

2

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **August 1, 2020, to October 12, 2020**;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service used by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 10 days of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of  21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957 involving Marquan L. Clemmer, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between Marquan L. Clemmer and others related to the relevant offense conduct of felon in possession of firearms, illegal use and possession of firearms, and sale and use of controlled substances;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the sale of

4

firearms and sale and use of controlled substances, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.    such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                               Signature